**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SPARKNET COMMUNICATIONS, L.P.,<br>a Nevada limited partnership, and<br>SPARKNET HOLDINGS, INC., a Nevada<br>corporation,<br><br>      **Plaintiffs,**<br><br>  **v.**<br><br>BONNEVILLE INTERNATIONAL<br>CORPORATION, a Utah Corporation,<br><br>      **Defendant.**<br>_____<br>BONNEVILLE INTERNATIONAL<br>CORPORATION, a Utah Corporation,<br><br>     **Counterclaimant,**<br><br>  **v.**<br><br>SPARKNET HOLDINGS, INC., A Nevada<br>Corporation,<br><br>     **Counterdefendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>**Case No. 05 C 2677**<br><br>**Magistrate Judge Morton Denlow** |

## <u>MEMORANDUM OPINION AND ORDER</u>

The music radio industry is highly competitive and radio stations seek to differentiate themselves in a variety of ways. This case involves a claim for trademark infringement and related state law claims in which the Plaintiffs claim that their "PLAYING WHAT WE WANT®" trademark has been infringed by the Defendant. The Defendant denies that there

is a likelihood of confusion in their use of the "70's, 80's ... WHATEVER WE WANT!", "70's, 80's ... WHATEVER WE FEEL LIKE!" and "TODAY'S NEW MUSIC ... and WHATEVER WE WANT" slogans, and denies that it is unfairly competing with Plaintiff.

The Court conducted a bench trial on the papers and heard oral argument on July 25, 2005. The Court has carefully considered the numerous declarations filed by the parties[1], the exhibits introduced into evidence, the briefs and closing arguments of counsel. The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

### A.    THE PARTIES.

1. The Plaintiffs are SparkNet Communications, L.P. ("SparkNet"), a Nevada limited partnership, and SparkNet Holdings, Inc. ("Holdings"), a Nevada corporation, (collectively referred to as "Plaintiffs").

2.    The Defendant is Bonneville International Corporation ("Bonneville" or "Defendant"), a Utah corporation. It has been in the radio business since the mid-1920's. Horowitz Dec. ¶ 20. Bonneville owns and operates 38 radio stations including WTMX in Chicago (also known as "101.9 THE MIX"), KKLT in Phoenix (also known as "98.7 THE PEAK"), WSSM in St. Louis (also known as "106.5 THE ARCH"), and KZBR in San

---

[1] Plaintiffs have filed declarations from Robert Barnett, George A. Burns, Alan Hague, Michael Henry, Reg Johns, Tracy Johnson, Randall Moeller, Robert Perry, Greg Strassell and Garry Wall. Bonneville has filed declarations from Kurt Hanson, Larry Hevner (professionally known as Joel Grey), Drew Horowitz, John Kijowski, Jay Krakowitz, David Quinto, David E. Simmons, Greg Solk and Charles Tweedle. The Court has cited to certain declarations in this opinion, but has considered the entire record in support of this decision.

Francisco (also known as "95.7 MAX FM"). *Id.* ¶ 6.

**B.     JURISDICTION AND VENUE.**

3.   This is an action brought by Plaintiffs for trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114, unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), dilution under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), common law unfair competition, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a.   Bonneville filed a counterclaim for service mark cancellation that has not as yet been tried and is not the subject of this opinion.

4.   This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 15 U.S.C. § 1121, 28 U.S.C. §§ 1338(a) and (b), and pursuant to principles of supplemental jurisdiction under 28 U.S.C. § 1367.   The parties have consented to a Magistrate Judge's jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

5.   Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Bonneville is doing business in this district.

**C.     THE MARK.**

6.   Robert Perry ("Perry") originally owned the Registered Mark, PLAYING WHAT WE WANT® (U.S. Trademark Registration No. 2,884,476) (the "Mark") for use in connection with internet streaming. Perry Dec. ¶ 2, Ex. A.  Perry first used the Mark on May 1, 2001 and he registered it with the U.S. Patent and Trademark Office ("PTO") on September 14, 2004. *Id.* ¶ 3, Ex. A.

7.   On June 16, 2005, Perry assigned to Holdings his entire right, title and interest to the Mark.  Holdings recorded the assignment with the PTO on June 22, 2005.  Accordingly,

Holdings owns the Mark and all rights therein.  Perry Dec. ¶¶ 5-6;  Comp. ¶ 14.  The Mark is used in connection with the JACK FM programming package.  Perry Dec. ¶ 4.

8.  SparkNet is the exclusive licensee of the Mark in the United States.  Pursuant to its license, SparkNet has the exclusive right to sublicense the Mark to broadcasters that make radio programming available throughout the United States.  Wall Dec. ¶ 8.

9.  Before SparkNet became the exclusive licensee of the Mark,  Perry granted Bohn and Associates ("Bohn") the exclusive right to use the Mark in the United States.  Perry Dec. ¶ 5.  Perry's agreement with Bohn (the "Agreement") allowed Bohn to sublicense the Mark. *Id.*  Bohn subsequently assigned all rights in the agreement to SparkNet, and Perry consented to that assignment.  *Id.* ¶ 6.

10.  JACK FM is a radio format that was developed by SparkNet and its predecessors. THE JACK FM branded radio product contains a broader and more eclectic music playlist than the typical music radio stations.  Burns Dec. ¶ 7.  The playlists of stations offering the JACK FM product typically contains 1200 or more songs and the song selections defy easy categorization.  *Id.*  Traditional broadcast models include playlists of only 300-400 songs. Johnson Dec. ¶ 6.

11.  THE JACK FM format has strong commercial appeal to companies such as Infinity Broadcasting Company and has been described as "fresh, irreverent, and unique." Barnett Dec. ¶ 5; Strassell Dec. ¶ 5.  As a result, Bohn was able to sublicense the JACK FM product to Infinity Broadcasting Corporation for use in Dallas, Los Angeles, Seattle, Minneapolis, Baltimore, Buffalo, New York City, and Chicago.  *Id.*  ¶ 7.  Infinity has not

launched the JACK FM format in San Francisco because Bonneville started up a MAX FM station in San Francisco on or about May 12, 2005 which uses the slogan "70's, 80's . . . WHATEVER WE FEEL LIKE." *Id.* ¶ 8. Infinity did launch the JACK FM format in Chicago on June 3, 2005, after Bonneville started up its new format and slogan in March, 2005. Solk Dec. ¶ 13; Strassel Dec. ¶ 8.

12. Those stations that have licensed the JACK FM format consider the PLAYING WHAT WE WANT mark to be an integral part of the JACK FM product. Strassel Dec. ¶ 6.

13. SparkNet and its predecessor have licensed the JACK FM format and the related PLAYING WHAT WE WANT trademark for use in at least 15 cities in the United States and expects to add many new stations. Wall Dec. ¶ 13. SparkNet and its licensees have spent and expect to spend millions of dollars to promote the JACK FM concept and the associated PLAYING WHAT WE WANT Mark. *Id.* ¶ 14-15.

14. SparkNet fears that it will suffer irreparable harm unless Bonneville is enjoined from using similar slogans. *Id.* at ¶ ¶ 37-42. Plaintiffs believe that Bonneville's radio products are inferior to their JACK FM branded product. Wall Dec. ¶ 41. Bonneville feels that its radio stations are better than Plaintiffs. Hevner Dec. ¶¶ 19-25; Kijowski Dec. ¶¶ 14-18; Solk Dec. ¶¶ 11-17.

## D. BONNEVILLE'S USE OF SLOGANS.

15. Bonneville has been in the radio industry since the mid-1920's. Horowitz Dec. ¶ 6. Bonneville presently operates 38 stations in the United States. *Id.* Bonneville's primary competitors include Clear Channel Communications, Infinity Broadcasting, Emmis

5

Communications, Entercom Communications, Cox Radio, Citadel Broadcasting, and Susquehanna Radio. *Id.* ¶ 7.

16. In each city in which Bonneville operates a station, the program director has discretion to tailor the station and its slogan to the geographic market. *Id.* ¶ 8.

17. There are three Bonneville slogans at issue. They are used in four cities. In Phoenix and St. Louis, Bonneville's stations use the slogan "70's", 80's..... WHATEVER WE WANT." Hevner Dec. ¶ 8; Kijowski Dec. ¶ 10. In Chicago, Bonneville uses the slogan "TODAY'S NEW MUSIC . . . AND WHATEVER WE WANT." Solk Dec. ¶ 14. Bonneville's San Francisco station uses the slogan "70's, 80's . . . . WHATEVER WE FEEL LIKE!" Tweedle Dec. ¶ 22. Bonneville has spent in excess of $1,500,000 to promote, publicize and market these three slogans. Horowiz Dec. ¶ 23. The slogans were developed without an intention to copy Plaintiffs' Mark. Solk Dec. ¶ 11.

18. Bonneville's slogans in Chicago, Phoenix, San Francisco and St. Louis never appear without the relevant stations' name and frequency. Horowitz. Dec. ¶ 18.

19. Bonneville has not received any communications from any of its listeners that have either confused Bonneville's slogans with Plaintiffs' slogans or associated Bonneville's slogans with Plaintiffs' stations. *Id.* ¶ 20.

**1. Phoenix - 98.7 THE PEAK.**

20. Larry Hevner ("Hevner") is the Program Director of 98.7 THE PEAK, KPKX-FM in Phoenix, Arizona. He was initially hired in August, 2000 by Emmis Communications, to be the Program Director for KKLT-FM, which was an Adult Contemporary Radio station. Hevner Dec. ¶ 4.

21. Hevner is responsible for all programming for 98.7 THE PEAK. *Id.* In addition, he consults with 106.5 THE ARCH in St. Louis, Missouri, and 95.7 MAX-FM in San Francisco, California. *Id.* ¶ 5.

22. Bonneville acquired 98.7 THE PEAK on December 1, 2004, from Emmis Communications. At the time of the acquisition, THE PEAK was already using its current format and slogan "70's, 80's . . . WHATEVER WE WANT." *Id.* ¶ 8.

23. When Bonneville acquired THE PEAK on December 1, 2004, Bonneville believed that its slogan "70's, 80's . . . Whatever We Want" had significant value and the reason the acquisition was made was because of the brand recognition, the ratings and cash flow of THE PEAK. Solk ¶ 7.

24. The predecessor of THE PEAK was KKLT-FM. KKLT-FM had operated as an adult contemporary station since the late 1980's. After Hevner joined the station in August, 2000, he made changes to the format, broadened the playlist, added personalities to the station, and spent thousands of dollars in marketing. Despite these changes, KKLT found itself in a head-to-head battle with KESZ, another adult contemporary radio station. *Id.* ¶ 9.

25. In January, 2004, Emmis hired Coleman Research to conduct a research project for the Phoenix radio market. The research revealed an opportunity for a format playing music from the 1970s through today. Coleman Research conducted a music test. Based on the Coleman research study and Hevner's own experience, Emmis made the format change and launched THE PEAK on May 28, 2004. The station adopted the following name and slogan at that time: "98.7 THE PEAK, 70's, 80's . . . WHATEVER WE WANT." *Id.* ¶ 10.

THE PEAK's format was created specifically for the Phoenix market after research uncovered listerner demand for more 70's classic hits music. Hevner Supp. Dec. ¶ 21 and Ex. F.

26. At the time, Hevner was monitoring the development of the "Bob" and "Jack" formats in Canada. Paul Ski at the Chum Group was using the slogan "80's, 90's and WHATEVER" at his "Bob " station in Winnepeg. Emmis obtained permission from Ski to use the "70's, 80's . . . WHATEVER WE WANT" slogan. *Id.* ¶ 13. The slogan was developed by Emmis Communications and was first used on May 28, 2004. *Id.* ¶ 8. At the time, there was only one JACK FM station in the United States located in Denver, Colorado. Hevner Supp. Dec. ¶ 20. The "Bob FM" concept and the "80's, 90's and WHATEVER" slogan was first used on CFWM in Winnepeg, Canada on March 4, 2002. Wall Dec. Ex. E.

27. THE PEAK is currently rated by Arbitron as the number one radio station in Phoenix for adults betwen the ages of 25-54. Hevner Supp. Dec. ¶ 16.

28. Only a small percentage of THE PEAK's total audience of approximately 275,000 listens via the internet. *Id.* ¶ 29. The overwhelming majority of THE PEAK's listeners reside in the Phoenix metropolitan area. *Id.* ¶ 30.

29. Bonneville has spent over $500,000 since January 1, 2005, to promote THE PEAK. *Id.* ¶ 32. THE PEAK would suffer significant monetary harm if it were required to adopt a new slogan. *Id.* ¶¶ 34-35.

30. When the decision was made to use THE PEAK's current format, Hevner was aware of the JACK FM and "Bob" formats in Canada. However, Hevner did not rely on the JACK FM format because he viewed it as generic and he wanted to customize a format for

the Phoenix community.  *Id.* ¶ 19.

31.  THE PEAK's slogan never appears without the station's call letters and frequency.  Therefore, every time a consumer sees the station's slogan, the consumer will also see THE PEAK and 98.7.  *Id.* ¶ 26.

32.  THE PEAK has received no communications from anyone to suggest any confusion between Plaintiffs' Mark and THE PEAK or THE PEAK's slogan.  *Id.* ¶ 28.

### 2.  St. Louis - 106.5 THE ARCH.

33.  Bonneville purchased the 106.5 FM dial position in St. Louis in October, 2000. At the time, the station used a young country format.  Bonneville changed the format to smooth jazz in January, 2001.  For the next four plus years, the station's ratings continued to struggle.  Kijowski.  Dec. ¶ 6.

34.  In 2000, John Kijowski was appointed General Manager for two of Bonneville's St. Louis stations, 101.1 The River and 106.5 Smooth Jazz.  *Id.* ¶ 3.  In November, 2004 he was promoted to Vice President Market Manager with responsibility for four St. Louis stations including 106.5 FM.  *Id.* ¶ 4.

35.  With revenues declining with the 106.5 smooth jazz format, Kijowski decided to reposition the station to a format with appeal to both genders.  *Id.* ¶ 7.

36.  At the time, he was aware that Bonneville's sister station in Phoenix, THE PEAK, was having great success with its new format and slogan, "70's, 80's .. . WHATEVER WE WANT."  *Id.* ¶ 8.  Kijowski began experimenting with THE PEAK format on a sister station for several weekends using the slogan "Whatever We Want Weekends."  The listener response was positive.  *Id.* ¶ 9.

37. Because of THE PEAK's success in Phoenix and the promising results generated by the weekend tests of its format, it was decided to rebrand 106.5 after THE PEAK and to adopt its slogan. On April 10, 2005, the station was rebranded "106.5 THE ARCH" with the slogan "70's, 80's, . . . WHATEVER WE WANT!" *Id.* ¶¶ 10-11. The station's advertising seeks to promote its identity as a St. Louis station as opposed to the generic JACK FM name used by Plaintiffs. *Id.* ¶¶ 10-13.

38. THE ARCH's slogan never appears without its call letters "THE ARCH" and its frequency 106.5. Therefore, consumers are always presented with the station's frequency and call letters whenever the slogan is used. *Id.* ¶ 19.

39. Only a small percentage of THE ARCH's audience of 182,000 listens via internet streaming. *Id.* ¶ 22.

40. THE ARCH has not received a single phone call, letter, or other correspondence from any listener expressing any confusion between THE ARCH and SparkNet's slogan or JACK FM station. *Id.* ¶ 21.

41. Bonneville has spent at least $125,000 promoting THE ARCH and plans to spend over $1,500,000in promoting the brand over the next five years. *Id.* ¶¶ 26-27. It would be expensive for THE ARCH to change its slogan. *Id.* ¶¶ 28-29.

**3. San Francisco - 95.7 MAX FM.**

42. Bonneville has operated a radio station in San Francisco at 96.5 FM for a number of years. The station had always been Bonneville's "problem child" due to consistently poor ratings. In approximately 2003, the station adopted a country music format. Unfortunately,

the station did not reach its rating goals. Tweedle Dec. ¶ 9.

43. Charles Tweedle ("Tweedle") has worked for Bonneville as Vice President and General Manger of KOIT 96.5 from 1985 until 1997, when Bonneville acquired two additional San Francisco stations, at which time he was named Market President and KOIT General Manager. In 2000, he was promoted to Senior Regional Vice President of Bonneville San Francisco and St. Louis. In November 2004, he was reassigned to directly oversee the Bonneville San Francisco stations and to work on special projects in addition to his role as Senior Regional Vice President. *Id.* ¶¶ 5-6.

44. Tweedle made the decision to develop and launch a new format on 95.7 by using funds set aside for undeveloped properties. *Id.* ¶ 11.

45. Tweedle considered a number of formats and ultimately decided to adapt Bonneville's successful THE PEAK format in Phoenix to the San Francisco market. *Id.* ¶ 13. He was aware of the JACK FM format that had been developed in Canada, but was not familiar with its specific characteristics. *Id.* ¶ 14.

46. He chose the name MAX because it is easy to remember, it is a name, and is an abbreviation of the word maximum connoting "maximum music and maximum variety." *Id.* ¶ 20. He did not chose the name MAX because of any alleged association with JACK FM. There are a number of radio stations that have adopted the names of natural persons. *Id.* ¶ 21.

47. In early May, 2005, he was informed that litigation was pending by Plaintiffs against Bonneville. He therefore chose a slogan that he believed was markedly different:

"70's, 80's . . . WHATEVER WE FEEL LIKE!"  *Id.* ¶¶ 22-23.

48.  MAX FM has not received any communication indicating any actual confusion with Plaintiffs' slogans or stations.  *Id.* ¶ 26.

49.  Bonneville has already spent over $700,000 to promote its MAX FM brand and format.  *Id.* ¶ 29.

**4.  Chicago - 101.9 THE MIX.**

50.  Bonneville currently has three radio stations in Chicago, including 101.9 FM known as THE MIX.  Solk Dec. ¶¶ 3 and 9.

51.  Greg Solk joined Bonneville in 1997.  He is currently responsible for all of Bonneville's Chicago properties in his role as Chief Programmer.  *Id.* ¶¶ 3-4.  In early 2005, he received  additional responsibilities as National Program Director - Music for Bonneville Radio nationwide for 34 music-based radio stations.  *Id.* ¶ 4.


52.  In adopting a new format and slogan for THE MIX, Solk was primarily influenced by THE PEAK's success in Phoenix with its slogan "70's, 80's . . . Whatever We Want."  *Id.*  ¶ 10.

53.  THE MIX adopted the slogan "TODAY'S NEW MUSIC . . . AND WHATEVER WE WANT" in March, 2005.  *Id.* ¶ 13.  Plaintiffs began their JACK FM station and related slogan in Chicago on June 3, 2005 on 104.3 FM.  *Id.* ¶ 13; Strassel Dec. ¶ 8.

54.  The decision to adopt the new format and slogan for THE MIX was prompted by the success of the format and slogan by THE PEAK in Phoenix and not the JACK FM slogan

12

or format. *Id.* ¶¶ 10-11.

55. THE MIX's slogan always appears with its call letters and frequency. *Id.* ¶ 20.

56. THE MIX has not received any communications indicating actual confusion with Plaintiffs' slogan or the JACK FM format. *Id.* ¶ 21.

57. Fewer than 10% of THE MIX's listeners listen via the internet and the overwhelming majority reside in the Chicago area. *Id.* ¶¶ 23-25.

58. THE MIX is planning to spend over $500,000 to promote the slogan through 2005.

**E.     INTERNET STREAMING AND TERRESTRIAL RADIO BROADCASTING.**

59. In the past several years, internet streaming has become increasingly popular. Hanson Dec. ¶ 8. Internet streaming is not regulated by the Federal Communications Commission ("FCC"). *Id.* ¶ 10.

60. Internet streaming differs from commercial radio broadcasting in that there are high barriers to entry in terrestrial radio broadcasting which generally require a multi-million dollar investment for capital equipment, FCC licensing, and other startup and operating expenses. *Id.* ¶¶ 11-12.

61. In contrast, it costs very little to establish and operate an internet streaming service. All that is needed is a computer, the appropriate software, and a little imagination. No FCC license is required. *Id.* ¶ 13.

62. Thousands of terrestrial radio stations offer internet streaming to their listeners as a supplemental service. *Id.* ¶ 15.

63. The internet radio market and the terrestrial radio market are radically different in terms of cost, regulation and market players. *Id.* ¶ 18.

## F. THE RELATIVE IMPORTANCE OF CALL LETTERS, RADIO FREQUENCY AND SLOGANS.

64. Call letters and radio frequency are significantly more important than slogans in identifying radio stations by consumers. Krakowitz Dec. ¶¶ 3-17. Hevner Supp. Dec. ¶¶ 4-10. The overwhelming majority of listeners identify radio stations by frequency. Krakowitz Dec. ¶¶ 13-15. Fewer than 10% of listeners identify radio stations by slogan. *Id.*

65. On June 14, 2005, Arbitron, Inc. and Edison Media Research released a detailed report entitled "Adult Hits: An Early Look at the Numbers Driving Radio's Newest Format" (the "Report"). Hevner Supp. Dec. Ex. A. The Report examined eight radio stations using an adult hit format including four JACK FM stations, three "Bob" stations and THE PEAK. Hevner Supp. Dec. ¶ 5.

66. The Report reveals that 68% of listeners identify radio stations by frequency, 35% identify them by call letters and only 19% identify radio stations by station name and/or slogan. *Id.* ¶ 6. Because the report lumps the two categories of station name and slogan together it is necessary to examine the actual Arbitron diary entries to break this category apart. An examination of all 173 diary entries concerning THE PEAK discloses that not one listener identified the station by its slogan. Instead, every listener classified by the Report as identifying 98.7 THE PEAK by station name and/or slogan did so by station name rather than the slogan. *Id.* ¶ 8.

67. The JACK FM stations display JACK FM more prominently than the Mark on

their websites and promotional materials.  Quinto Dec. ¶¶ 5 and 13, Ex. E.

## G.    USE OF SIMILAR SLOGANS BY THIRD PARTIES.

68.  At least nine radio stations in the United States use descriptive slogans as follows:

a.    97.3 "Joe-FM" in Saginaw, Minnesota which uses the slogan "80's, 90's . . . whatever we want";

b.    106.9 KZY in Ocala/Gainesville, Florida which uses the slogan "The 80's, 90's . . . whatever we want!";

c.    92.7 "My-FM" in Fargo, North Dakota which uses the slogan "we play everything";

d.    103.3 "Ed-FM" in Albuquerque, New Mexico which uses the slogan "we play stuff we like";

e.    103.9 "Ted-FM" in Columbus, Ohio which uses the slogan "we play everything";

f.    103.9 "Bob-FM" in Spokane, Washington which uses the slogan "80's . . . 90's . . . & Whatever";

g.    105.1 "Mike-FM" in Santa Maria, California which uses the slogan "playing anything!";

h.    95.7 "Ben-FM" in Philadelphia, Pennsylvania which uses the slogan "Playing anything we feel like"; and

i.    92.5 "The Chief" in Champaign/Urbana, Illinois which uses the slogan "The Chief Plays Whatever The Chief Wants."

Id. ¶ 13 and Ex. C.

## II.  TRIAL ON THE PAPERS

69.  This case comes before the Court by means of a trial on the papers in which the

parties have submitted briefs and supporting exhibits which constitute the record in this case.

*See Sullivan v. Bornemann,* 384 F.3d 372, 375 (7th Cir. 2004) (noting that a district court

decision, rendered after reviewing the stipulated facts of the parties, was more akin to a

bench trial than summary judgment, and was thus governed by Federal Rule of Civil Procedure 52(a)); *Hess v. Hartford Life & Accident Ins. Co.,* 274 F.3d 456, 461 (7th Cir. 2001) (entering a judgment based upon a stipulation of facts that made up an administrative record was treated as a bench trial governed by Fed. R. Civ. P. 52(a)); *Brach's Confections, Inc. v. McDougall,* 320 F.Supp. 2d 726 (N.D. Ill. 2004) (conducting a trial on the papers in an ERISA case); Morton Denlow, *Trial on the Papers: An Alternative to Cross-Motions for Summary Judgment*, Fed. Lawyer, Aug. 1999, at 30. The parties agreed to proceed in this manner and to waive their right to present oral testimony and they have waived their right to a jury. The parties agree that the Court may make findings to decide contested issues of fact. The parties agree that the Court may consider the declarations and given them such weight as the Court deems appropriate based on the Court's review after considering the arguments of counsel. The trial on the papers is intended to decide only the issue of liability in connection with Plaintiffs' Second Amended Complaint.

### III. BURDEN OF PROOF ON LIKELIHOOD OF CONFUSION

70. The Lanham Act provides national protection of trademarks in order to secure to the owner of the marks the goodwill of its business and to protect the ability of customers to distinguish among competing businesses. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985). National protection of trademarks is desirable because trademarks foster competition and the maintenance of quality by securing to a company the benefits of a good reputation. *Id.*

71. In order to prevail under their federal trademark infringement claim (count I),

federal unfair competition claim (count II), trademark dilution claim (count III), state common law unfair competition claim (count IV), and Illinois Consumer Fraud and Deceptive Business Practices Act claim (count V), Plaintiffs must prove at least two facts by a preponderance of the evidence: 1) their mark is protectable; and 2) Bonneville's use of its competing slogans is likely to cause confusion among consumers. *CAE, Inc. v. Clean Air Eng'g*, 267 F.3d 660, 673-74 (7th Cir. 2001); *Eli Lilly & Co., v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir. 2000). In this case, Plaintiffs hold a federal registration for the MARK. There is a dispute regarding the prior use of Bonneville's marks and whether the Mark is protectable. Because the Court can decide this portion of the case without deciding the issue of validity, the Court will reserve ruling on the issue of validity until it considers Bonneville's counterclaim for service mark cancellation. Therefore, the principal issue is whether consumers are likely to be confused about the identity or source of the radio stations in the marketplace. *Reed-Union Corporation v. Turtle Wax, Inc.*, 77 F.3d 909, 911-12 (7th Cir. 1996).

72. The Court's ultimate conclusion on the likelihood of confusion is a question of fact. *CAE, Inc*., 267 F.3d at 677. The plaintiff must prove a "likelihood" of confusion, not a mere "possibility" of confusion. *See Eli Lilly & Company v. Natural Answers, Inc.,* 233 F.3d 456, 461-62 (7th Cir. 2000); *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 619 (7th Cir. 1995) (finding no preliminary injunction should issue because there was only a possibility of consumer confusion). Because a trademark is an identifier rather than a property "right," the use of a competitor's mark that does not cause confusion as to source

is permissible. *Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1362 (7th Cir. 1995); *see* 15 U.S.C. § 1114(1)(b). The likelihood of confusion must be determined with reference to the realities of consumer behavior in the relevant market. *Rust Env't & Infrastructures Inc. v. Teunissen*, 131 F.3d 1210, 1216 (7th Cir. 1997). Plaintiffs must prove that such likelihood of confusion would occur to a significant number of consumers and not merely in an isolated situation. *CAE, Inc.*, 267 F.3d at 677; *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 173 (7th Cir. 1996) (affirming summary judgment for defendant finding "we think it is wholly unlikely that any significant number of consumers would be misled. And this is the test."); *Libman Co. v. Vining Industries, Inc.*, 69 F.3d 1360, 1364 (7th Cir. 1995) (holding no trademark infringement where no evidence that a "significant fraction" of the relevant market could have been misled).

73. In evaluating the likelihood of consumer confusion for this claim of trademark infringement, the factors to be considered include:

a.      the degree of similarity between the marks in appearance and suggestion;

b.      the similarity of the products for which the name is used;

c.      the area and manner of concurrent use;

d.      the degree of care likely to be exercised by consumers;

e.      the strength of the complainant's mark;

f.      any evidence of actual confusion; and

g.      an intent on the part of the alleged infringer to palm off its products as those of another.

*Ty Inc. v. Jones Group, Inc.,* 237 F.3d 891, 897 (7th Cir. 2001). None of these factors by itself is dispositive of the likelihood of confusion question; different factors will weigh more heavily from case to case, depending upon the particular facts and circumstances involved. *Id.* at 898. Even if the majority of the factors tilt the scale in favor of one side, the "weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion." *Id.* Often, the three most important factors are the similarity of the marks, the intent of the defendant, and the evidence of actual confusion." *Id.*

## IV. APPLICATION OF THE LIKELIHOOD OF CONFUSION FACTORS TO THE EVIDENCE PRESENTED.

### A. THE MARKS ARE NOT SIMILAR IN APPEARANCE AND SUGGESTION

The first factor is the similarity in appearance and suggestion. The Mark and Bonneville's slogans are not similar in appearance and suggestion for several important reasons. First, the Mark and Bonneville's slogans are always used in conjunction with the radio station's call letters and station frequency. Plaintiffs' Mark is used in connection with the JACK FM radio brand and the specific frequency, for example 104.3 JACK FM PLAYING WHAT WE WANT. The Mark is used secondarily to promoting the JACK FM brand and the frequency on which the station broadcasts. The reason for this is simple. If you want listeners to tune in, they must be able to locate the station. Therefore, Plaintiffs always promote the radio frequency when they use the MARK. Second, Bonneville's slogans contain additional information not contained in Plaintiffs' Mark, "70's, 80's . . . WHATEVER WE WANT!", "70's, 80's . . . WHATEVER WE FEEL LIKE!" and

"TODAY'S NEW MUSIC . . . and WHATEVER WE WANT."  These slogans are more specific in describing the music era than Plaintiffs' "PLAYING WHAT WE WANT®" Mark.  While on JACK FM one might expect to hear classical and folk music in addition to rock, Bonneville's slogan is more limiting in its description of the type of music the listener should expect to hear.

74.  The Court must consider similarities and dissimilarities between the marks in their entireties and in the light of what occurs in the marketplace, not in the courtroom.  *James Burroughs Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir. 1976).  When viewed in this light, it is clear that Bonneville's slogans are not similar in appearance and suggestion because they are always used in conjunction with the station's call letters and frequency and because they contain descriptive modifiers "70's, 80's," or "TODAY'S NEW MUSIC", which Plaintiffs choose to ignore, but which the Court must consider.

## B.     THE PRODUCTS ARE SOMEWHAT SIMILAR

75.  Although Plaintiffs and Bonneville both offer music on the radio, there are significant differences in their formats.  A comparison of Bonneville's 98.7 THE PEAK format with JACK FM reveals the following differences.  THE PEAK:

(a)     has distinctive radio personalities, including John O'Hurley of Seinfeld fame as "Mr. Peakerman";

(b)     has male and female local disc jockeys;

(c)     conducts research relating to the station's audience and customizes the station accordingly;

(d)     hosts local competitions and contests;

(e)     provides weather information;

(f)     provides traffic information;

(g)     regularly announces special events occurring with Phoenix;

(h)     presents the news; and

(i)     features discussions of topics of concern to Phoenix consumers.

Hevner Dec. ¶ 21.

76.  In contrast, the JACK FM format is generally characterized by the following:

(a)     no use of radio personalities;

(b)     no disc jockeys, but rather pre-recorded announcements over and over;

(c)     no research for the purpose of customizing the format to local markets;

(d)     no weather information;

(e)     no traffic information;

(f)     no news;

(g)     no announcements of special events in the local area;

(h)     no discussions or on-air commentary; and

(i)     the same name – i.e., "Jack FM" – across all stations.

Hevner Dec. ¶ 22.  Similar differences exist between 106.5 THE ARCH and JACK FM.

Kijowski Dec. ¶¶ 14-16.  Similar differences exist between 101.9 THE MIX and the JACK

FM format.  Solk Dec. ¶¶ 15-16.  Similar differences also exist between 95.7 MAX FM and

the JACK FM format.  Tweedle Dec. ¶¶ 16-18.

77.  The Court's inquiry under this factor in comparing the two products is not

whether they are interchangeable, but whether "the parties' products are the kind the public might very well attribute to a single source." *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1089 (7th Cir. 1988). It is possible that a listener of a local radio station could perceive an internet radio station as coming from the same source. However, because both parties take care to identify their brands as JACK FM, THE PEAK, THE ARCH, THE MIX, and MAX FM, this factor does not weigh in Plaintiffs' favor.

## C.    THE AREA AND MANNER OF CONCURRENT USE IS DIFFERENT

78. In examining whether the area and manner of concurrent use is likely to cause confusion, the issue is "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Ty Inc.*, 237 F.3d at 900. Several relevant factors are important, including 1) the relative geographical distribution areas, *see Rust Env't & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1217 (7th Cir. 1997); 2) whether there exists evidence of direct competition between the products, *see Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330 (7th Cir. 1993); and 3) whether the product is sold through the same marketing channels, *see Nike, Inc., v. "Just Did It" Enters.*, 6 F.3d 1225, 1230 (7th Cir. 1993). *Ty Inc.*, 237 F.3d at 900.

79. Plaintiffs' JACK FM stations have not operated in Phoenix, San Francisco or St. Louis. Horowitz Dec. ¶ 21.

80. Plaintiffs' argument that its broadcasts are available over the internet does not prove that consumers from other cities actually tune in. Plaintiffs have failed to prove actual listeners to its JACK FM stations in Phoenix, San Francisco or St. Louis or the quantity of

those listeners.  Plaintiffs have failed to prove concurrent use in those cities.

81.  Only a very small percentage of Bonneville's total audience in Chicago, Phoenix, San Francisco and St. Louis tune into stations through the internet.  Hevner Dec. ¶¶ 27-28. Therefore, it is highly unlikely that any significant number of consumers in these four cities will confuse a Bonneville station for a JACK FM station or associate Bonneville's slogans with Plaintiffs' Mark.

## D.    THE CONSUMERS ARE LIKELY TO EXERCISE CARE IN SELECTING THEIR RADIO STATION

82.  The Plaintiffs have failed to prove that consumers are not likely to exercise care in selecting their radio station.  Because Plaintiffs' print ads use the MARK in conjunction with the JACK FM brand and the station's frequency, consumers seeking to hear the JACK FM brand of music will easily identify the source.  Furthermore, those scanning their dial are much more likely to decide whether to remain on a particular station by the music they hear, rather than a slogan or Plaintiffs' Mark.  Plaintiffs simply have not proven that a listener who happens to hear Bonneville's "70's, 80's . . . WHATEVER WE WANT!" slogan will be so turned off by the station that she will not listen to another JACK FM station or that she will steer away from JACK FM.  This is a far fetched theory based on mere speculation.

## E.    PLAINTIFFS HAVE FAILED TO PROVE THE STRENGTH OF THEIR MARK IN THE MARKETPLACE.

83.  The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source.  *Eli Lilly,* 233 F.3d at 464.

84.  Plaintiffs have failed to prove that they have a strong mark such that a radio

listener is likely to be confused as to the source of the music or station. Plaintiffs' witnesses all include the different components of the JACK FM brand (i.e., the name "JACK FM", the frequencies, and the slogan, "Playing What We Want") when discussing the strength of the Mark. The Plaintiffs have failed to provide the Court with survey or other evidence to demonstrate a likelihood of confusion. In fact, Bonneville's evidence that over 80% of consumers identify a station by its frequency and less than 10% identify a station by its slogan is persuasive. Krakowitz Dec. ¶¶ 13-16.

85. Even a JACK FM licensee acknowledges that it is highly unlikely that Bonneville's use of its slogans will cause confusion because the slogans are always featured in conjunction with the relevant station's name and frequency. Simmons Dec. ¶ 5.

86. The fact that Plaintiffs have spent money on advertising does not answer the question of whether the advertising was successful in identifying the Mark as a source as opposed to identifying JACK FM and the station's frequency as the source.

87. Plaintiffs' Mark is hardly unique. The Mark is neither invented nor arbitrary. Instead, it represents a collection of commonly used words: "playing" "what" "we" "want." Used together as a mark, these words mean to choose their own music. This common meaning of the words renders such mark weak and greatly limits its scope of protection. *M-F-G Corp. v. EMRA Corp.*, 817 F.2d 410, 411 (7th Cir. 1987) (noting that a plaintiff cannot exclusively appropriate "part of the language that it has neither created nor enriched" nor deny another party "a natural description for its products"). Bonneville's slogans constitute a natural description for its music using basic English words.

**F. THERE WAS NO EVIDENCE OF ACTUAL CONFUSION.**

88. In considering this factor, the Court must look to evidence of *actual* confusion, not a mere risk of confusion. *Eli Lilly,* 233 F.3d at 465.

89. There was no evidence of actual confusion. Hevner Dec. ¶ 28; Horowitz Dec. ¶ 20; Kijowski Dec. ¶ 21; Solk Dec. ¶ 21. There was much self-serving speculation by Plaintiffs. Barnett Dec. ¶ 12; Burns Dec. ¶ ¶ 13-14; Hague Dec. ¶ 9; and Johnson Dec. ¶ 12.

**G. BONNEVILLE DID NOT INTEND TO PALM OFF ITS STATIONS AS THAT OF PLAINTIFFS.**

90. The final factor is Bonneville's intent. Plaintiffs have failed to prove that Bonneville was attempting to trade on Plaintiffs' goodwill or to mislead the public into believing that its radio stations were in some way affiliated with Plaintiffs. Bonneville acted in good faith to develop a competitive product based upon its own independent research and the success of THE PEAK in Phoenix. Plaintiffs' format, including its broad playlist, is not subject to trademark protection any more than the myriad of radio music formats such as: smooth jazz, country, adult standards, hot adult contemporary, top 40, young country, alternative rock, and mainstream. Bonneville is entitled to describe its music through its slogan. It has properly done so. Bonneville identified its stations by their call letters and frequency when using the slogans. It did not act with intent to confuse the public. *M.B.H. Enterprises, Inc. v. WOKY, Inc.,* 633 F.2d 50, 54 (7th Cir. 1980) (Party acted in good faith when identifying itself by call letter and frequency when using slogan).

**H.    PLAINTIFFS HAVE FAILED TO PROVE A LIKELIHOOD OF CONFUSION.**

91.   As explained in <u>McCarthy on Trademarks and Unfair Competition § 23.63 (4th ed. 2005</u>), "There are at least three evidentiary routes to prove a likelihood of confusion:  1. survey evidence; 2. evidence of actual confusion; and/or 3.  argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace."   The Court has weighed all of the evidence and finds that Plaintiffs have failed to meet their burden of proving a likelihood of confusion.  No survey evidence.  No direct evidence.  No evidence as to the strength of the Mark's brand name awareness separate and apart from the use of the JACK FM brand and station frequency.  The Court finds no reasonable inference can be made that confusion in the market will "likely" occur. Possible confusion? Only a slight and far fetched possibility.  The Court has no doubt that Plaintiffs' able counsel can concoct a scenario by which confusion possibly could occur. However, possibilities and proof are two different things.  There has been a failure of proof and therefore Plaintiffs cannot prevail.

92.   Furthermore, even if Plaintiffs could prove a "likelihood of confusion" with competent evidence, Plaintiffs did not demonstrate that such confusion would affect a "substantial" or "significant" number of radio listeners in the marketplace.  Plaintiffs are not operational with stations in St. Louis, San Francisco or Phoenix, and they have provided no evidence regarding internet listenership to out-of-state stations in these cities.  Similarly, they were second to market in Chicago and have shown no actual or likely confusion between its "104.3 JACK FM PLAYING WHAT WE WANT" listeners and the "101.9 THE MIX

TODAY'S NEW MUSIC . . . AND WHATEVER WE WANT" listeners. Plaintiffs' case is rife with speculation and self-serving testimony but little proof. As the Seventh Circuit has stated: "[A] finding of likely confusion can no more be based on pure conjecture or a far fetching narrative alone than any other finding on an issue on which the proponent bears the burden of proof." *Libman Co. v. Vining Industries, Inc.*, 69 F.3d 1360, 1363 (7th Cir. 1995).

## V. PLAINTIFFS' ANTI-DILUTION CLAIM

93. There are four elements to a Trademark Dilution Claim: 1) the Mark is famous; 2) Bonneville adopted their slogans after the Mark became famous; 3) Bonneville's use of its slogans causes dilution of the Mark; and 4) Bonneville's use of its slogans is commercial and in commerce. 15 U.S.C. § 1125(c)(1); *Eli Lilly,* 233 F.3d at 466. The likelihood of confusion and whether Bonneville competes with Plaintiffs are irrelevant. *See* 15 U.S.C. § 1127; *Eli Lilly,* 233 F.3d at 466.

94. Plaintiffs have failed to prove either a sufficiently famous mark or that its Mark is being diluted. Therefore, Plaintiffs' anti-dilution claim fails.

## VI. PLAINTIFFS' STATE LAW CLAIMS

95. Having failed to prove a likelihood of confusion, Plaintiffs cannot recover under its state unfair competition claim (count IV), or the Illinois Uniform Deceptive Trade Practices Act (count V). *See McGraw-Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1174 (7th Cir. 1986) ("[L]ikelihood of confusion has the same meaning in unfair competition cases under the Deceptive Trade Practices Act as it has in traditional infringement cases."); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th

Cir. 1993) ("The state unfair competition claim is analyzed under the likelihood of confusion standard and thus mirrors our infringement analysis.").

## VII.  CONCLUSION

Plaintiffs and Bonneville compete in certain markets for music radio listeners. Plaintiffs have promoted the JACK FM brand and have used the slogan PLAYING WHAT WE WANT® in connection with its JACK FM brand.  Plaintiffs acknowledge that they do not seek to prevent Bonneville from copying its format, but only to prevent Bonneville from infringing its Mark and competing unfairly.  Bonneville denies that it is copying the JACK FM format, which it perceives to be inferior to its own music radio formats.  Bonneville does not infringe Plaintiffs' Mark and does not unfairly compete with Plaintiffs because its slogans fairly describe the music it plays and its slogans are used in connection with its own radio frequencies and station names.

Plaintiffs have failed to meet their burden of proof.  Plaintiffs have failed to prove that consumers are likely to be confused about the identity or source of the radio stations in the marketplace.  This battle is better fought in the marketplace than in court.  Trademark protection should not interfere with the traditional policies of a competitive market because the public benefits from competition.  If every radio station that adopts a slogan containing one or more overlapping words, which describes the music they play, is brought into court, only the lawyers will benefit.  Plaintiffs are not entitled to a permanent injunction or any other relief.

Pursuant to the foregoing findings of fact and conclusions of law, **the Court enters judgment in favor of defendant, Bonneville International Corporation, and against Plaintiffs, SparkNet Communications, L.P., and SparkNet Holdings, Inc., on all counts of Plaintiffs' Second Amended Complaint.**

**SO ORDERED THIS 9th DAY OF SEPTEMBER, 2005.**

_____
**MORTON DENLOW**
**United States Magistrate Judge**

**Copies mailed to:**

**Attorneys for Plaintiffs:**

Derek A. Newman
Newman & Newman
505 Fifth Avenue South
Suite 610
Seattle, Washington 98104

Charles Lee Mudd, Jr.
3344 North Albany Avenue
Chicago, Illinois 60618

**Attorneys for Defendant:**

David W. Quinto
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 S. Figueroa Street
10th Floor
Los Angeles, California 90017

Andrew B. Bloomer
Kirkland & Ellis, LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636